## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ATOMIC CAFE, INC. and JOHN MAHONEY<br><br>       Plaintiffs,<br><br>       v.<br><br>KYLE ROY, PETER ROY, COLD BREW VENTURES, LLC, and LEAN & LOCAL, LLC, d/b/a LEANBOX and d/b/a GRIND or GRIND COFFEE<br><br>       Defendants. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

The Atomic Cafe, Inc. ("Atomic Cafe") and John Mahoney (together with Atomic Cafe, "Plaintiffs"), by and through their counsel, McLane Middleton, Professional Association, complain against Kyle Roy, Peter Roy (the "Roys"), Cold Brew Ventures, LLC, Lean & Local, LLC, d/b/a LeanBox and d/b/a Grind or Grind Coffee (each, a "Defendant", collectively, the "Defendants") as follows:

### PRELIMINARY STATEMENT

1.    Plaintiffs petition this Court for preliminary and permanent injunctive relief to stop Defendants from infringing Plaintiffs' trademarks and misappropriating and using Plaintiffs' confidential trade secret formulas, personal property, and business contacts in connection with the cold brew venture they were operating jointly until Defendants' pushed Plaintiffs out.

2.    Using his considerable experience, knowledge, goodwill, and reputation in the coffee industry, Plaintiff Mahoney developed a new cold brew beverage manufacturing facility,

introduced Defendants to his confidential cold brew formulas and processes, and introduced Defendants to his customers and contacts in furtherance of their joint venture.

3.      In exchange, Plaintiff Mahoney was to receive a 25% equity stake in the business, an employment contract, and other financial benefits.  Plaintiffs detrimentally relied on Defendants' financial promises in performing their end of the bargain, selling off part of the Atomic Cafe business to dedicate even more attention to the parties' venture.

4.      The Defendants, suddenly and without warning, reneged on the deal after the facility became operational and Plaintiffs' knowledge effectively had been transferred.  Further, after unilaterally withdrawing from their partnership with Plaintiffs, Defendants continue to operate the venture Plaintiff Mahoney designed and built using his company's trademarks, his proprietary cold brew formulas, and confidential business contact lists, all without Plaintiffs' authorization.  As a result, Plaintiffs also demand a jury trial so the trier of fact can determine the extent of damages Plaintiffs' suffered as a result of Defendants' wrongdoing.

## PARTIES

5.      Plaintiff Mahoney is an individual having an address of 8 Castle Road, Salem, MA  01970.

6.      The Atomic Cafe, Inc. is a Massachusetts corporation, with a principal place of business at 45 Mason Street, Unit 1, Salem, MA  01970.  Plaintiff Mahoney is the President of Atomic Cafe.

7.      Defendant Kyle Roy is an individual having an address of 126 Main Street, Hingham, MA  02043-2507.

8.      Defendant Peter Roy is an individual having an address of 1166 Washington Street, Apt. 401, Boston, MA  02118-4112.

9.      Upon information and belief, Cold Brew Ventures, LLC is a Delaware limited liability company, with a principal place of business at 10 Jewell Drive, Wilmington, MA 01887.

10.     Lean & Local, LLC, d/b/a LeanBox and d/b/a Grind or Grind Coffee (collectively, "LeanBox") is a Massachusetts limited lability company, with a principal place of business at 60 Massachusetts Avenue, Boston, Massachusetts.

11.     Defendants Kyle and Peter Roy are brothers and, upon information and belief, principals of Defendants Cold Brew Ventures, LLC and LeanBox.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Kyle Roy and Peter Roy because they are domiciled in the Commonwealth of Massachusetts and because the acts and omissions to act described in this Complaint occurred substantially within the Commonwealth of Massachusetts.

14.     This Court has personal jurisdiction over Defendant CBV because the acts and omissions to act related to Defendant CBV described in this Complaint occurred substantially within the Commonwealth of Massachusetts.

15.     This Court has personal jurisdiction over Defendant LeanBox because the acts and omissions to act described in this complaint related to Defendant LeanBox occurred substantially within the Commonwealth of Massachusetts.

16.     Venue is proper in the United States District Court District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

17.     Plaintiff Mahoney has over twenty-years of coffee-industry experience. He operates his coffee business through a Massachusetts corporation, The Atomic Cafe, Inc. Plaintiff Mahoney is the President of Atomic Cafe.

18.     Over the years, Plaintiff Mahoney built a successful and recognizable coffee brand: Atomic Coffee Roasters.  Atomic Cafe owns two registered trademarks related to the Atomic Coffee Roasters brand, Registration Numbers 5291915 and 5291905 (collectively, the "Trademarks").  **Exhibit 1**, the Trademarks.

19.     Before partnering with Defendants, Atomic Cafe owned three retail coffee shops throughout the Commonwealth—Beverly, Marblehead, and Newburyport (each, a "Cafe").  Each Cafe uses and has used the Trademarks and other indicia of the Atomic Cafe brand for marketing and to brand a variety of items in the Cafes and items the Cafes' sold including, without limitation, coffee (hot and cold brewed), coffee beans, labels, coffee mugs, signs, menus, gift cards, shopping bags, t-shirts, bottles, kegs, taps, and websites (including social media).

20.     Atomic Cafe also owns and operates a roasting, toll-roasting, and kegging facility in Salem, Massachusetts (the "Salem Facility").  The Salem Facility is where Plaintiff Mahoney researched, tested, and finalized his proprietary cold brew coffee, latte, and tea formulas and processes (each, a "Formula", collectively, the "Formulas").  The Salem facility provided its various products to the Atomic Café retail cafes, and to Atomic Café's customers, frequently on a made to order basis.

21.     Each Formula is proprietary.  Plaintiff Mahoney specifically selects the coffee bean used, coffee (or tea)-to-water ratio, proper grind settings, steep time and temperature, dilution ratio, concentrates, and other factors that relate to the production of cold brew

beverages.  For beverage product placed in bottles, his Formula is additionally unique and proprietary because it uses a specific bottling technique to produce a flavorful cold brew product with extended shelf-life that also complies with applicable food safety requirements set by the Food & Drug Administration ("FDA"), as confirmed by independent lab results.

22.     Before partnering with Defendants, Plaintiffs only shared the details of the Formulas with a limited number of Atomic Cafe employees on a need-to-know basis at his Salem facility.  The Salem Facility was not open to the public, except by appointment.  The Formula recipes were kept in Plaintiff Mahoney's file cabinet in his office.  His employees understood that both the recipes for roasting and the Formulas for cold brew products are proprietary and not to be disclosed outside of the confines of the Salem Facility.  Employees received instructions that they were not to photograph or place on the internet photos or information about the operations of the Salem Facility.   Only four to five people were entrusted with the Formulas and roasting recipes.

23.     In addition to his proprietary Formulas, Plaintiff Mahoney maintains a confidential list of business contacts he has made throughout his twenty-years in the coffee business.  These business contacts include, for example, current and potential wholesale and retail customers, coffee brokers, and industry consultants (the "Business Contacts").  Over the course of his business career, Mr. Mahoney has built relationships, credibility, good will, and a positive reputation with the Business Contacts by providing exceptional product and service. These confidential business relationships are critical to maintaining and growing market share in the competitive coffee business.

24.     Before partnering with Defendants, Plaintiff Mahoney was the principal point of contact with customers.  Atomic Cafe roasted coffee and made cold brew beverages on a made-

to-order basis. That business model placed a premium on maintaining strong and effective relationships with the customer base, which Plaintiff Mahoney was tasked to accomplish. Plaintiff Mahoney maintained his Business Contacts with a limited number of Atomic Cafe employees on a need-to-know basis.

25.     Upon information and belief, the Roys are co-founders of LeanBox. LeanBox is a company that delivers "smart" vending machines and provides food vending services to businesses in the Commonwealth and elsewhere.

26.     Upon information and belief, Grind or Grind Coffee ("Grind") is LeanBox's coffee business. Grind coffee products are offered in connection with LeanBox's smart vending machines and office supply services. According to published reports, Grind was launched at or near the time of the completion of the Wilmington Facility, which is described further below.

## The Cold Brew Venture

27.     Upon information and belief, the parties' relationship began around February, 2016 with an industry custom: a taste test. Plaintiff Mahoney invited Defendant Kyle Roy to his Cafe to try his cold brew products.

28.     Almost immediately after the tasting, Defendant Kyle Roy acknowledged the uniqueness of Plaintiff Mahoney's Formulas, explaining that the cold brew products tasted and poured better than Defendants' current partners' products.

29.     In April 2016—not long after their initial meeting—Plaintiff Mahoney and Defendant Kyle Roy discussed a deal for Atomic Cafe to supply LeanBox with kegged cold brew coffee using Plaintiff Mahoney's Formulas.

30.     Just a few months later, in or around September 2016, the parties agreed to move their business relationship beyond arms-length transactions into operating a cold brew joint

venture.  The venture's objective was to establish a business that manufactured and distributed Atomic Cafe's cold brew products (based on the Formulas) to wholesale and retail customers on a larger scale than Plaintiffs' existing production facility could produce.  They called this venture "Cold Brew Ventures" ("CBV").

31.    In light of current coffee-marketplace trends, and given the potential synergies resulting from a combined effort of the parties' companies, the parties' agreed that $10 million to $12 million in revenue by CBV's five-year mark was achievable.  After reaching that mark, the parties expected to find a suitable purchaser to acquire CBV for five to six times revenue.

32.    Defendants knew that Plaintiff Mahoney's role in this venture was critical to its success.  They recognized their own experience paled in comparison to Plaintiff Mahoney's industry and manufacturing know-how.  Early correspondence between Defendant Kyle Roy and Plaintiff Mahoney confirmed the importance placed on Plaintiff Mahoney's skillset.  The parties thus agreed the only way to adequately compensate Plaintiff Mahoney for all that he brought to the venture was to give him a significant ownership stake in CBV and a fixed salary under a term employment contract, plus other financial benefits.

33.    In reliance on these promises—a significant ownership stake, guaranteed salary, and other benefits—Plaintiff Mahoney spent the next year fulfilling his obligations to CBV.

### *Plaintiffs Designed, Built and Provided Equipment to CBV's Roastery*

34.    To achieve their business objective, Plaintiff Mahoney advised Defendants that CBV needed its own coffee roasting facility, similar to his Salem Facility, but larger.  Defendants leased a 15,000 square-foot space in Wilmington, Massachusetts (the "Wilmington Facility").

35.    Plaintiff Mahoney orchestrated the team that designed and configured the Wilmington Facility, and worked closely with the general contractor.  Using his contacts, he

sourced all of the equipment installed for the roasting and brewing operations. Some of the equipment in the facility belongs to the Plaintiffs, including the following:

    a.    five 50-gallon brew kettles with false bottoms

    b.    twelve 2.5 gallon "mini" kegs

    c.    mobile sample cooler

    d.    150 rubber topped corny kegs

    e.    two refractometers

    f.    one 160-gallon letina flat bottom tank with top and stand

    g.    Restoration hardware office desk and two chairs

    h.    5 gallon buckets with spigots

    i.    chugger pump with hoses and all fittings

    j.    red nitrogen tank and two wheeler

    k.    two dunnage racks

    l.    two Dewalt nut/bolt organizer trays

    m.    one 735-gallon Stainless Steel mix tank

    n.    two nitrogen regulators with hoses and fittings

    o.    $CO_2$ tank with cart, regulator, hoses and fittings

    p.    elf 50 table top labeler

36.    While overseeing the Wilmington Facility's design and construction, Plaintiff Mahoney was also responsible for securing the Wilmington Facility's food processing and distribution license from the Commonwealth's Department of Public Health, Bureau of Environmental Health, Food Protection Program (the "License").

37.     He worked closely with the Commonwealth to resolve issues associated with the Wilmington Facility that would have barred CBV from receiving the License.

38.     He also worked with a long-time food industry consultant, Bianka Legrand, to ensure the Wilmington Facility was built for producing legally compliant and safe-for-consumption product, and to ensure the facility had the proper protocols and policies to comply with the many rules and regulations involving food manufacturing.

39.     As a result of Plaintiff Mahoney's efforts, the License for the Wilmington facility was issued on June 20, 2017 to "Cold Brew Ventures" and "Atomic Coffee Roasters". The License identified him as the point of contact.  **Exhibit 2**, the License.

40.     Upon information and belief, the Wilmington Facility was completed in approximately July 2017.

41.     Once completed, Plaintiff Mahoney was charged with overseeing the Wilmington Facility's operations, which included, for example, without limitation:

         a.      Working with Bianka Legrand to develop industry-standard policies and procedures designed to ensure Wilmington Facility personnel kept the facility food-safe.

         b.      Managing certain Wilmington Facility personnel, such as arranging for the hiring of Brian Fines—a former beer brewer—to serve as the facility's General Manager, and teaching him about the proprietary cold brew Formulas and processes.

         c.      Monitoring the Wilmington Facility's inventory and tracking units sold, despite not having access to CBV's financials (which Defendants promised he would).

*Building the Business*

42.     In addition to his work on the Wilmington Facility, Plaintiff Mahoney attended to creating and increasing CBV's business.

43.     Plaintiff Mahoney expanded CBV's product reach by opening the Wilmington Facility to toll-roasting and co-pack business opportunities—business lines of the coffee industry about which Defendants knew little or nothing.   These product lines offered CBV diversified sources of revenue and maximized the Wilmington Facility's value.

44.     While Plaintiff Mahoney expanded the Wilmington Facility's product offerings, he was also expanding CBV's business connections.   He contacted several of his Business Contacts to let them know about CBV and that this venture could meet a variety of their cold brew product needs.   Moreover, as confidential Business Contacts contacted Plaintiff Mahoney, Plaintiff Mahoney would connect them with Defendants, believing that passed-through business to CBV stood to benefit all of them.

45.     Plaintiff Mahoney maintained the confidential nature of his Business Contacts, sharing them only with Defendants on a need-to-know basis.   When sharing these Business Contacts with Defendants, Plaintiff Mahoney was led to believe, and did believe, he was doing so with his business partners and co-owners.

46.     Upon information and belief, Defendants continue to contact Plaintiff Mahoney's confidential Business Contacts in connection with their coffee business.

47.     In addition to supplying his Formulas and Business Contacts to CBV, Plaintiff Mahoney was open to the Defendants and CBV leveraging the goodwill associated with Atomic Cafe's Trademarks.   Use of Atomic Cafe's Trademarks, however, was always subject to Plaintiff Mahoney's prior approval.

48.     Over the last year, in furtherance of CBV, Defendants used the Trademarks and other Atomic Cafe indicia in a variety of ways including, without limitation, marketing, product

labeling, websites, kegs, bottles, brochures, email signatures, employee contracts, invoices, and other billing documentation.

49.     Upon information and belief, Defendants are still using the Trademarks in connection with their coffee business—without Atomic Cafe's or Plaintiff Mahoney's permission.

50.     For example, as of October 5, 2017, Atomic Cafe's Trademark appeared on Grind's website, a pertinent screenshot of which is attached as **Exhibit 3**.[1]  Next to it:

> The innovators behind LeanBox have partnered up with local artisan coffee roaster John Mahoney to create Grind coffee.  Through the use of truly fresh products, innovative & flexible equipment solutions, and fully customizable programs, Grind strives to bring the barista experience right into your office.

51.     LeanBox also continues to use and associate with Atomic Cafe's Trademarks and other indicia of Atomic Cafe.  For example, as of October 5, 2017, Atomic Cafe's Trademark and other indicia appeared on LeanBox's website in connection with a job posting for a Coffee Brewing Assistant.[2]

52.     Furthermore, upon information and belief, Defendants continue to use the Trademarks and other indicia of Atomic Cafe in connection with cold brew kegs it delivers to customers.  Specifically, as of October 3, 2017, Defendants labeled cold brew kegs with Plaintiffs' unique "wrap" which depicts Plaintiffs' Trademark and their specialized cold brew label.  The kegs provided a "Best Buy" date of October 26, 2017.  **Exhibit 4**, Photographs of Cold Brew Kegs and Labels.  Plaintiffs, however, have a 30-day limit on cold brew product "Best Buy" dates, and the last time Plaintiffs supplied Defendants with cold brew product was

---

[1] *Available at*, www.grindcoffee.com/about-grind-coffee/ (last visited Oct. 5, 2017).

[2] *Available at*, www.https://leanbox.recruitee.com/o/coffee-brewing-assistant (last visited Oct. 5, 2017).

September 22, 2017.  Defendants are either supplying customers with cold brew products produced by Plaintiffs outside of the recommended "Best Buy" date using Atomic Café's name and labeling, or purporting to sell Plaintiffs' cold brew products, but actually selling another cold brew product, or both.

53.    The keg "wraps" depicting the Trademarks and the specialized labels were professionally designed for Atomic Cafe, and were used long before any affiliation with Defendants.  Plaintiffs' use the specialized labeling on a variety of other coffee products.  *See* **Exhibit 4**.

54.    Upon information and belief, Defendants are using the Trademarks and other indicia of Atomic Cafe without Atomic Cafe's and Plaintiff Mahoney's permission on several other public facing products in connection with their coffee business.

*Agreement on All Material Terms*

55.    Over the course of the summer 2017, the parties put into writing the terms to which they had previously agreed:  Plaintiff Mahoney was to receive a 25% membership interest with special voting rights for the first three years in a Delaware limited liability company, Cold Brew Ventures, LLC ("Cold Brew Ventures, LLC")—a business name Plaintiff Mahoney selected—that was formed in May 2017.  The material terms of the corporate documents reflecting Plaintiff Mahoney's interest in the company were agreed upon, but not signed.  A five-year employment agreement, paying $150,000 per year, with options to renew, was finalized, but not signed.

56.    In addition, as part of the transaction, material terms were agreed upon for Defendant Cold Brew Ventures, LLC to purchase the fifty-percent interest of Andrew Mahoney, Plaintiff Mahoney's brother, in the Salem Facility.  Plaintiff Mahoney agreed to purchase his

brother's remaining interest in Atomic Cafe in reliance upon the income he was to receive from his employment contract with Defendant Cold Brew Ventures, LLC.

57.     With the material terms substantially all finalized by August 2017, Defendant Kyle Roy circulated organizational documents identifying Plaintiff Mahoney as the highest ranking personnel in two of three departments, referring to him as "Owner – Director of Operations & Production (the "Org. Chart").  **Exhibit 5**, Org. Chart.

58.      Defendant Kyle Roy explained that the Org. Chart and other process documents he shared with Plaintiff Mahoney were purposefully designed to assign Plaintiff Mahoney as head of three-fourths of CBV's business.

59.     Defendant Kyle Roy designated himself the "Owner – Director of Business Dev." in the Org. Chart, a position for which Plaintiff Mahoney's Business Contacts were and remain critical.

60.     Understanding that his promised role with CBV would consume significant portions of his time, Plaintiff Mahoney made other material changes to his Atomic Cafe's business operations.  For example, Plaintiff Mahoney arranged for the sale of the Newburyport Cafe,  entered into an agreement to sell the Marblehead Cafe, and agreed to purchase his brother's interest in the Atomic Cafe business based on income he was to receive from CBV.

*Defendants' Failure to Follow Proper Protocols*

61.     Following the opening of the Wilmington Facility, Defendants Roy and LeanBox attempted to integrate LeanBox operations into the same facility.  In doing so, Defendants Roy and LeanBox caused to be violated the FDA required protocols and procedures for a food manufacturing plant.  Plaintiff Mahoney became so concerned he arranged for Ms. Legrande to conduct an audit of the Wilmington Facility in late August and early September.

62.     Her audit revealed that LeanBox and its employees jeopardized the Wilmington Facility's operations (and the public) when it decided to store LeanBox product at the facility without proper licensure.  Her audit also revealed that, in the process of bringing LeanBox product to the Wilmington Facility, LeanBox employees committed numerous food-safety policy infractions within the Wilmington Facility, such as the lack of a plan to prevent comingling of food allergens with other food product that should be kept separate, leaving trash and debris on the ground, and entering and exiting the facility in an uncontrolled manner.

63.     On or about September 17, 2017, Defendant Kyle Roy informed Plaintiff Mahoney that CBV customers experienced operational and billing issues.

64.     On September 18, Plaintiff Mahoney personally called each client to discuss their concerns.  As Plaintiff Mahoney relayed back to Defendant Kyle Roy, verbally and in writing, each account commended the coffee product produced under Plaintiffs' Formulas, giving high praise about the quality and taste.  The chief concern raised by these accounts regarded the distribution, installation, and billing components of the business, all of which were Defendants' responsibilities.

65.     Defendant Kyle Roy agreed that customer issues stemmed from areas that were within Defendants' responsibilities and that changes were needed at the Wilmington Facility to address the audit findings.  Defendant Kyle Roy acknowledged Plaintiff Mahoney's efforts to smooth things over with customers and was glad he got out in front of them.

66.     Yet, on that same day, September 18, 2017, Defendant Peter Roy sent Plaintiff Mahoney an email explaining that, based on this *one* conversation between Plaintiff Mahoney and Defendant Kyle Roy, Defendants were no longer interested in their long-term commitment with him.  Defendant Peter Roy reneged on the agreed upon terms.  Instead, he offered only a

reduced stake of 7.5%, contingent upon Plaintiff Mahoney continuing to supply CBV with roasted coffee using his Formulas and contingent upon Plaintiff Mahoney's signing a non-compete and non-solicitation agreement, despite the fact that many of CBV customers are Plaintiff Mahoney's Business Contacts.  A copy of Defendant Peter Roy's email is attached as **Exhibit 6** to this Complaint.

67.     Further discussion and communication with Defendant Peter Roy only produced additional unsupportable excuses for reneging on the deal.

68.     Upon information and belief, Defendants Peter and Kyle Roy relied on inconsistent rationales for reneging on Defendants' promises to Plaintiff Mahoney as a pretext for Defendants true motives: Reclaiming Plaintiff Mahoney's ownership interest in CBV now that it was fully operational at the Wilmington Facility, had personnel that Plaintiff Mahoney trained in the use of his Formulas capable of producing cold brew products using Plaintiff Mahoney's Formulas, was connected with Plaintiff Mahoney's confidential network of Business Contacts, benefiting from the good will associated with the Trademarks, and on course to reach the five-year revenue target.

69.     Upon information and belief, Defendants had, prior to pulling out of their agreement with Plaintiff Mahoney, already offered ownership interests in the Defendant Cold Brew Ventures, LLC to others, contrary to the terms of their agreements, and were otherwise seeking to capture business opportunities for  themselves or their affiliates.

## CAUSES OF ACTION

### *COUNT I:*
### Trademark Infringement
### Lanham Act, 15 U.S.C. § 1114

70.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

71.     Atomic Cafe owns the right to use the Trademarks set forth on **Exhibit 1**.

72.     Defendants have used and continue to use Atomic Cafe's Trademarks, without Atomic Cafe's authorization.

73.     Defendants unauthorized use of Atomic Cafe's Trademarks is intended to cause and has caused confusion, mistake, or deception among consumers, the public and the trade as to whether Defendants' products originate from, or are affiliated with, sponsored by, or endorsed by Plaintiffs.

74.     Defendants have acted with knowledge of Atomic Cafe's ownership of the Trademarks and with deliberate intention to unfairly benefit from the incalculable goodwill symbolized by the marks.

75.     Defendants' infringement will cause imminent and irreparable harm and injury to Plaintiffs, and Plaintiffs are without an adequate remedy at law.

76.     As a direct and proximate result of Defendants' trademark infringement, pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to injunctive relief, damages, lost profits, attorneys' fees, and other remedies as provided by law.

*COUNT II:*
**Unfair Competition and False Designation of Origin**
**Lanham Act, 15 U.S.C. § 1125(a)**

77.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

78.     Defendants, without authorization from Atomic Cafe, have used and continue to use designations that are identical to, or substantially indistinguishable from, the Trademarks.

79.     Defendants have intentionally engaged in conduct that constitutes a false designation of origin, a false or misleading description of fact, and a false or misleading representation of fact tending wrongfully and falsely to describe or represent a connection or affiliation between Defendants and Plaintiffs in violation of 15 U.S.C. § 1125(a).

80.     The public is likely to be confused by Defendants' use of such false designation of origin and false descriptions or representations regarding Defendants' goods and Atomic Cafe's goods.

81.     Defendants' actions will cause imminent and irreparable harm and injury to Plaintiffs, and Plaintiffs are without an adequate remedy at law.

82.     As a direct and proximate result of Defendants' unfair competition, pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to injunctive relief, damages, lost profits, attorney's fees and other remedies as provided for therein.

*COUNT III:*
**Common Law Trademark Infringement**

83.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

84.     Plaintiffs own all right, title, and interest in and to the Trademarks, including all common law rights in the Trademarks in the United States.

85.     Defendants, without Plaintiffs' authorization, have used and continue to use the Trademarks, or marks substantially indistinguishable from the Trademarks, in connection with their businesses.

86.     Defendants' actions are intended to cause, have caused, and are likely to cause confusion, mistake, and deception among consumers, the public, and the industry as to whether Defendants' services promoted under the infringing mark originate from, or are affiliated with, sponsored by, or endorsed by Plaintiffs.

87.     Defendants have acted with knowledge of Plaintiffs' ownership of the Trademarks and with deliberate intention to unfairly benefit from the incalculable goodwill symbolized thereby.

88.     Defendants' wrongful conduct therefore constitutes trademark infringement in violation of the common law.

89.     As a direct and proximate result of Defendants' unlawful acts, Plaintiffs have suffered, are suffering, and will continue to suffer harm, injury, and damages in the form of lost sales, lost profits, and damage to its goodwill and business reputation, for which Plaintiffs are entitled to relief.

90.     As a result of the acts described above, Plaintiffs have suffered and are suffering immediate and irreparable harm, and have no adequate remedy at law to address all of the injuries that Defendants' have caused and continue to cause.  Plaintiffs are therefore also entitled to preliminary and permanent injunctive relief.

COUNT IV:
**Taking/Misappropriation of Trade Secrets**
**Mass. Gen. Laws. ch. 93, § 42**

91.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

92.     Plaintiffs' Formulas and Business Contacts are trade secrets that derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.

93.     Plaintiffs took reasonable steps to maintain the secrecy of their Formulas and Business Contacts.

94.     Defendants improperly gained access to the Formulas by partnering with Plaintiffs, then retracting that partnership once Defendants knew how to produce cold brew products using the Formulas.

95.     Defendants improperly gained access to the Business Contacts by partnering with Plaintiffs, then retracting that partnership once Defendants received the contact information for several coffee-industry contacts that Plaintiffs' maintained as confidential Business Contacts.

96.     Defendants misappropriated and continue to misappropriate the Formulas by producing cold brew products that use all or part of the Formulas, without Plaintiffs' authorization.

97.     Defendants misappropriated and continue to misappropriate Plaintiffs' Business Contacts by contacting and conducting business with such Business Contacts, without Plaintiffs' authorization.

98.     Defendants' misappropriation of Plaintiffs' trade secrets was and continues to be at all times willful and malicious.

99.     As a direct and proximate result of Defendants' unlawful acts, Plaintiffs have suffered, are suffering, and will continue to suffer harm, injury, and damages in the form of lost sales, lost profits, and damage to its goodwill and business reputation, for which Plaintiffs are entitled to relief.  Plaintiffs are also entitled to enhanced damages, as provided by statute.

100.    As a result of the acts described above, Plaintiffs have suffered and are suffering immediate and irreparable harm, and have no adequate remedy at law to address all of its injuries that Defendants' have caused and continue to cause.   Plaintiffs are therefore entitled to preliminary and permanent injunctive relief.

*COUNT V:*
**Breach of Actual or Implied Contract**

101.    Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

102.    On or about September 2016, Defendants agreed to give Plaintiff Mahoney a significant ownership stake and guaranteed employment contract in connection with CBV.  On or about June 2017, Defendants specified that Plaintiff Mahoney's ownership stake would be 25% of a newly formed LLC and that he would receive a five-year, fixed salary ($150,000 per year) employment contract, plus other benefits.

103.    From that point forward, Plaintiffs conferred a benefit to Defendants including, without limitation, Plaintiff Mahoney's supervision of the design and construction of the Wilmington Facility, his planning and scaling of CBV's business lines, the use of his Formulas, Business Contacts, and Atomic Cafe's Trademarks.

104.     Plaintiffs' conferred a benefit to Defendants with the expectation that Plaintiffs would be compensated as had been discussed and agreed—specifically, the ownership stake in CBV, the fixed salary employment contract, and other, direct and indirect financial benefits.

105.     Defendants accepted Plaintiffs services with the expectation they would compensate Plaintiff Mahoney for the benefits Plaintiffs' conferred.

106.     Defendants materially breached the parties' actual or implied contract.

107.     As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm and are entitled to recover damages, costs, attorneys' fees, and injunctive relief, all within the jurisdictional limits of this Court.

## COUNT VI:
## Promissory Estoppel

108.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

109.     Defendants promised Plaintiff Mahoney that he would receive a significant ownership stake in CBV, an employment contract and other, direct and indirect financial benefits if he took the lead on overseeing the construction of the Wilmington Facility, building and increasing the CBV business, and providing his Formulas, business contacts, and business knowledge.

110.     Defendants should have reasonably expected that such promises would induce Plaintiffs into dedicating countless hours and resources, and disclosing confidential trade secrets to Defendants to help the CBV become successful.

111.     Those promises did, in fact, induce Plaintiffs into taking such actions as described in this Complaint.

112.    Defendants, however, improperly or in bad faith, have repudiated their promises to Plaintiffs.

113.    As a result of their promises, Defendants are estopped from breaching their promises.  Plaintiffs are entitled to enforcement of the promises, or damages caused by their breach, or both, plus interest, costs and attorneys' fees.

## COUNT VII:
## Violation of Mass. Gen. Laws. ch. 93A, §§ 2, 11

114.    Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

115.    The Atomic Cafe, Inc. is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

116.    Mr. John Mahoney is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

117.    Mr. Kyle Roy is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

118.    Mr. Peter Roy is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

119.    Lean & Local, LLC d/b/a LeanBox and d/b/a Grind or Grind Coffee is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

120.    Cold Brew Ventures, LLC is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

121.    Defendants used unfair methods of competition and unfair and deceptive acts or practices in the conduct of their business with the Plaintiffs in violation of M.G.L. c. 93A.

122.     Defendants' practices, as set forth above, including, but not limited to, using the guise of partnership to unlawfully extract Plaintiff Mahoney's coffee manufacturing knowledge, trade secrets, and goodwill in the Trademarks, and capturing business opportunities meant for CBV, constitute willful and knowing violations of M.G.L. c 93A §§ 2 & 11, and/or the Attorney General's Regulations promulgated thereafter.

123.     These actions primarily and substantially occurred within the Commonwealth of Massachusetts.

124.     As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm and are entitled to recover damages, costs, attorneys' fees, and injunctive relief, all within the jurisdictional limits of this Court.   Defendants' conduct has been willful and knowing and, therefore, Plaintiffs are entitled to have its damages trebled.

### COUNT VIII:
### Unjust Enrichment

125.     Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

126.     Plaintiffs conferred a benefit upon Defendants by designing the Wilmington Facility, planning and increasing CBV's business lines, sharing the Formulas and the Business Contacts, and allowing use of the Atomic Cafe's Trademarks, among other things.

127.     Defendants were aware that this benefit was being conferred to them.   They understood Plaintiffs' provision of these benefits were conditioned upon Plaintiff Mahoney receiving a significant ownership stake in CBV, specified salary under an employment contract, and other benefits.

128.     Defendants have violated these conditions and the mutual understanding of the parties.

129.    It would be inequitable and unjust for Defendants to retain the benefits and funds they received and continue to receive, despite their wanton disregard for their mutual understanding with Plaintiffs.

130.    The Plaintiffs request that the Court should find that Defendants would be unjustly enriched unless they are ordered to pay Plaintiffs damages, costs, and attorneys' fees, all within the jurisdictional limits of this Court.

## COUNT IX:
### Breach of the Covenant of Good Faith and Fair Dealing

131.    Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

132.    All contracts, including actual and implied contracts, contain an implied covenant of good faith and fair dealing.

133.    Defendants' conduct, as described herein, constitute a breach of the covenant of good faith and fair dealing.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm and are entitled to recover damages, costs, attorneys' fees, and injunctive relief, all within the jurisdictional limits of this Court.

## COUNT X:
### Fraudulent Inducement

135.    Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

136.    Plaintiffs entered into an agreement with Defendants to develop and operate CBV.

137.    To induce the Plaintiffs to enter into the agreement, Defendants made misrepresentations of  material fact when Defendants promised Plaintiff Mahoney a 25% equity

stake in the business, a five-year employment contract, and other, direct and indirect, financial benefits in return for his considerable experience, knowledge, trade secrets, goodwill, and reputation in the coffee industry.

138.    The Defendants knew that its promises were false and misleading because Defendants had no intention of fulfilling their obligations and promises.

139.    Plaintiffs relied, to their detriment, on Defendants' promises in performing their part of the partnership bargain and reducing their Atomic Cafe business interests in favor of the new venture.

140.    Plaintiffs' willingness to assent to the terms of the agreement, and the agreement itself, was induced by the material, fraudulent misrepresentations of the Defendants.

141.    As a result of relying on Defendants' misrepresentations, Plaintiffs have been damaged in an amount within the jurisdictional limits of the court, plus interest, costs, and attorneys' fees.

*COUNT XI:*
**Conversion**

142.    Plaintiffs restate and reallege each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

143.    The Plaintiffs contributed equipment and personal property to the Wilmington Facility.

144.    The Plaintiffs have a right to immediate possession and control of their property.

145.    The Defendants, without right or permission from the Plaintiffs, improperly exercised control over and converted for their own use the Plaintiffs' equipment and personal property.

146.    The Plaintiffs are entitled to immediate return of their property in the same condition in which they were provided.  In the absence of such return, as a direct and proximate result of Defendants' conduct, Plaintiffs will suffer harm and are entitled to recover damages, costs, attorneys' fees, and injunctive relief, all within the jurisdictional limits of this Court.

### COUNT XII:
### Replevin

147.    Plaintiffs restate and realleg each and every allegation in the preceding paragraphs above and incorporate them into this Count as if fully set forth herein.

148.    Plaintiffs are the owner of, or entitled to possession of, the equipment and personal property contributed by the Plaintiffs to the Wilmington Facility.

149.    The equipment and personal property have a value greater than twenty dollars.

150.    Plaintiffs' property is wrongfully being detained by the Defendants against Plaintiffs' claim of right to possession.

151.    Plaintiffs are entitled to immediate return of their property, plus interest, costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Atomic Cafe, Inc. and Mr. John Mahoney respectfully request the Court enter judgment as follows:

A.    Preliminarily and permanently enjoin Defendants, their officers, agents, employees, and attorneys, and all those persons or entities in active concert or participation with them, from the following activities, pursuant to 15 U.S.C. § 1116: (i) directly or indirectly infringing Atomic Cafe's Trademarks; (ii) creating any impression that Defendants' products or services have any association, connection or affiliation with Plaintiffs; (iii) competing unfairly with Plaintiffs or continuing to hold themselves out as authorized representatives of Plaintiffs;

and (iv) engaging in any other conduct that is likely to cause confusion or cause mistake or to deceive as to the source, affiliation, connection or association of Plaintiffs' services with the Defendants;

B.      Preliminarily and permanently enjoin Defendants and all those persons or entities in active concert or participation with them, from the following activities: (i) using all or any part of Plaintiffs' Formulas in any products Defendants' produce; (ii) manufacturing, producing, and selling cold brew products; and (iii) contacting, soliciting, or conducting business with any of Plaintiffs' confidential Business Contacts.

C.      Preliminarily and permanently enjoin Defendants and all those persons or entities in active concert or participation with them, to return, in good and operable condition, the equipment that Plaintiffs provided to the Wilmington Facility as described above.

D.      Preliminarily and permanently enjoin Defendants and all those persons or entities in active concert or participation with them, from the following activities: Manufacturing any food products at the Wilmington Facility using the License with Atomic Cafe's name and with Plaintiff Mahoney as the contact.

E.      Require Defendants to file with this Court and serve on Plaintiffs, within thirty days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the requirements of the foregoing injunction and orders;

F.      Award Plaintiffs compensatory and punitive damages, exemplary damages, and attorneys' fees, costs, and expenses under each count of this Complaint, in an amount to be determined at time of trial, together with pre-judgment and post-judgment interest accrued thereon; and

G.      Award such other and further relief this Court shall deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rules 38 and 39 of the Federal Rules of Civil Procedure, Plaintiffs demand a

trial by jury on all issues triable as of right by a jury.

Respectfully submitted,

THE ATOMIC CAFE, INC. AND
JOHN MAHONEY

By their attorneys,

McLANE MIDDLETON,
PROFESSIONAL ASSOCIATION

Date:  October 6, 2017               By:  /s/ Mark C. Rouvalis
                                          Mark C. Rouvalis, BBO # 552460
                                          900 Elm Street, P.O. Box 326
                                          Manchester, NH  03105-0326
                                          Telephone (603) 625-6464
                                          mark.rouvalis@mclane.com

12757963